IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

LARRY F. MAY,                       )
                                    )
        Plaintiff,                  )
                                    )
                                    )    CIV-13-564-R
v.                                  )
                                    )
CAROLYN W. COLVIN,                  )
  Acting Commissioner of Social     )
  Security Administration,          )
                                    )
        Defendant.                  )

REPORT AND RECOMMENDATION

Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of Defendant Commissioner denying his application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423. Defendant has answered the Complaint and filed the administrative record (hereinafter TR___), and the parties have briefed the issues. The matter has been referred to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B). For the following reasons, it is recommended that the Commissioner's decision be reversed and remanded for further administrative proceedings.

I. Background

Plaintiff filed his application for benefits on June 14, 2010, and alleged that he became

1

disabled on April 28, 2010. (TR 127-128). Plaintiff described his disabling impairments as type II diabetes, uncontrolled, peripheral neuropathy in his feet, legs, and arms, pacemaker due to cardiac arrhythmia, depression, and learning disability/ dyslexia. (TR 159). He stated that he stopped working on April 28, 2010, due to his conditions. (TR 159). Plaintiff has a high school education and previously worked for fourteen years as a machinist building air conditioner coils. (TR 160-161).

The medical record reflects that Plaintiff underwent electromyography ("EMG") testing conducted by Dr. Pittman, a neurologist, in May 2010. Plaintiff complained of numbness and tingling in both feet that was worsening, with associated leg weakness and sharp, shooting pain, acute vision loss in his right eye that occurred one time three months previously and lasted fifteen minutes, and occasional lightheaded dizziness. (TR 225). Dr. Pittman noted that on examination Plaintiff exhibited no loss of muscle strength and some decreased sensation in his lower extremities. (TR 225). Dr. Pittman's diagnostic impression was mild distal axonal sensorimotor polyneuropathy with secondary features of demyelination and possible superimposed left lateral plantar neuropathy. (TR 226).

Dr. Pittman recommended that Plaintiff undergo computerized tomographic ("CT") angiography testing of his neck, brain, and head, and these tests were normal. (TR 219-221). Plaintiff had a pacemaker implanted in 1991 due to sick sinus syndrome. In 2009, the pacemaker was extracted due to an infection, and a new pacemaker was implanted in August 2009. (TR 344-345). Plaintiff was released to return to work without restrictions in September 2009. (TR 349).

Plaintiff was treated by Dr. Mahmood, an internist, beginning in September 2009 for diabetes mellitus Type II and hypertension. Dr. Mahmood noted in September 2009 that Plaintiff's diabetes was uncontrolled, medications were prescribed, and Plaintiff was advised on his diet and exercise. (TR 390).

In December 2009, Dr. Mahmood noted Plaintiff returned for follow-up treatment after seeking hospital emergency room treatment for high blood sugar and chest discomfort. Dr. Mahmood noted Plaintiff looked comfortable, his motor system was intact, and his gait was normal. (TR 360). Plaintiff described an episode of vision loss for a few seconds in his right eye. Dr. Mahmood's diagnostic assessment was uncontrolled diabetes, stable hypertension, partial vision loss without known cause, pacemaker, and obesity. (TR 361). Plaintiff's diabetic medication was adjusted, and he was advised to see his ophthalmologist and cardiologist. (TR 361).

In February 2010, Dr. Mahmood noted that Plaintiff returned for follow-up treatment. On physical examination Plaintiff showed full strength, normal gait, full range of motion of his upper and lower extremities, normal affect, good mood, and no deficits other than some decreased sensation in his left foot and "cold" feet. (TR 358). Plaintiff complained of numbness in the toes of his right foot and muscle pain and cramping in his calves and toes. He was referred to a podiatrist, and a diagnostic assessment of diabetic neuropathy in both feet was added, for which Neurontin®, a nerve pain medication, was prescribed. (TR 359). Dr. Mahmood changed the Neurontin® to Lyrica® at Plaintiff's next office visit in May 2010 and referred Plaintiff to a diabetic treatment center. (TR 357).

3

Dr. Mahmood completed a disability claim form for Plaintiff's employer's disability insurance carrier in May 2010 in which the physician stated that Plaintiff could not "stand or walk for over 30 minutes [and] should not lift [over] 10 [pounds]" due to peripheral neuropathy, uncontrolled diabetes mellitus, and dizziness with vision disturbances. (TR 400).

In June 2010, Plaintiff complained to Dr. Mahmood of right upper extremity joint pain and metacarpal joint pain, tingling and numbness in his left hand and both legs, and sharp, increasing pain in his right foot. Cymbalta® was prescribed by Dr. Mahmood for neuropathic pain. (TR 354-355). Dr. Mahmood noted in September 2010 that Plaintiff was taking three medications for peripheral neuropathy and seeing a neurologist for this condition. Dr. Mahmood increased the Lyrica® and Cymbalta® medications and discontinued the gabapentin (Neurontin®). (TR 353). Plaintiff returned to Dr. Mahmood for follow-up treatment in January 2011 and July 2011, and the physician's office notes indicate Plaintiff did not complain of joint or muscle pain or weakness/numbness. (TR 534-535).

In June 2010, Plaintiff began treatment with Dr. Azar at the Harold Hamm Oklahoma Diabetes Center. Plaintiff described a history of type II diabetes diagnosis 15 years previously and inability to control the condition since that time. He had been insulin dependent for 7 to 8 years. (TR 430). A physical examination was not remarkable, and Dr. Azar noted Plaintiff exhibited normal mood, affect, attention, and concentration. (TR 431-432). Plaintiff's diabetic medications were adjusted. Plaintiff's medications were also adjusted in follow-up office visits during 2010 (TR 434-437, 491). At Plaintiff's office visit in February 2011, Dr. Azar noted Plaintiff was doing better and his blood sugar readings had

4

improved. (TR 487-489). In April 2011, Dr. Azar again noted that Plaintiff's blood glucose levels were better controlled with his present insulin regimen. (TR 485).

Plaintiff underwent cardiac testing and examination in October 2010 conducted by Dr. Joseph, and the results were normal. (TR 447-452). Plaintiff saw Dr. De Sousa, a neurologist, for treatment in June 2011. After reviewing Plaintiff's medications and history and conducting a physical examination, Dr. De Sousa reported a diagnostic impression of peripheral neuropathy probably due to diabetes, for which Amitriptyline® was prescribed. The neurologist noted he could not confirm Plaintiff's complaint of weakness and suggested that Plaintiff's reported difficulty standing from a seated position could be more related to sensory ataxia/deconditioning.

Dr. De Sousa noted additional diagnostic impressions of transient visual loss, likely due to a transient ischemic attack, and for which aspirin and further CT testing was recommended, diabetes mellitus with autonomic neuropathy ("infrequent" symptoms were noted), unspecified sleep disturbance, asthma, potassium deficiency, and questionable magnesium metabolism disorder. (TR 478-479).

Dr. Tafur reported in July 2011 that he had conducted macrovascular and venous evaluations of Plaintiff, and the testing was within normal limits. (TR 527). In July 2011, Dr. Mahmood completed a Physical Medical Source Statement in which the physician opined that Plaintiff could sit for 3 hours at a time and 4 hours in an 8-hour workday, stand for 2 hours at a time and 3 hours in an 8-hour workday, and walk for 4 hours at a time and 5 hours in an 8-hour workday. (TR 480). Dr. Mahmood also opined that Plaintiff could lift 10

5

pounds continuously and 25 pounds frequently, use his feet for repetitive movements without limitation, use his left hand for grasping without limitation, but was limited in his use of his right and left hands for grasping or fingering, and limited in his use of his left hand for fingering. (TR 480-481). Plaintiff could occasionally bend or reach but could never squat, crawl, or climb, and was markedly limited in his ability to perform activities involving unprotected heights around moving machinery, in environments with marked changes in temperature and humidity, exposure to dust, and vibrations. (TR 481). As objective findings to support the RFC evaluation, Dr. Mahmood noted Plaintiff was diagnosed with peripheral neuropathy, transient visual loss, and autonomic neuropathy. Plaintiff's "nerve conduction study shows [illegible] of conduction delay to [illegible]," he has "sensory ataxia which will make his trunk and walking unstable," and his "autonomic neuropathy will make his pulse/blood pressure fluctuate on standing and [illegible]." (TR 481).

Plaintiff testified at an administrative hearing conducted on August 30, 2011, before Administrative Law Judge Gordon ("ALJ"). (TR 23-51). Plaintiff was 44 years old at the time of the hearing, and he stated he was receiving long-term disability from his former employer, that he last worked in April 2010 as a machinist, and that he quit working due to neuropathy in his feet making him unable to stand due to pain. The pain was constant but somewhat relieved by sitting with his feet elevated which he did on and off during the day. He estimated he could walk fifty yards, sit for 20 minutes, lift fifteen to twenty pounds, had trouble bending, and had trouble sleeping. He did not grocery shop or perform household chores, and he had numbness in his hands with difficulty gripping objects, dyslexia,

6

dizziness, weakness, and blurred vision due to diabetes. He described diabetes-related autonomic neuropathy which caused loss of balance about two times per week and being bedridden due to diabetes about three times per week. Plaintiff's wife and a vocational expert ("VE") also testified at the hearing.

The ALJ issued a decision in September 2011 in which the ALJ found that Plaintiff had severe impairments due to obesity, diabetes mellitus, type II, peripheral neuropathy, and cardiac arrhythmia status-post pacemaker implantation. (TR 12). The ALJ found that Plaintiff's complaints of depression and dyslexia caused no more than minimal work-related mental limitations and were therefore nonsevere. (TR 12).

Following the agency's sequential evaluation process, the ALJ found at step three that Plaintiff's impairments or combination thereof did not result in impairments severe enough to meet or medically equal the severity of a listed impairment. (TR 13). At step four, the ALJ reviewed the medical and nonmedical evidence and found that Plaintiff had the residual functional capacity ("RFC") to perform work at the sedentary exertional level. (TR 14). He was capable of lifting up to 10 pounds occasionally. He could "sit, stand, or walk for a total of two hours in an eight-hour workday," occasionally crouch, kneel, balance, crawl, stoop, and climb stairs, but he could never climb ladders or scaffolds, and he should avoid slippery, wet, or moving surfaces. (TR 14).

In light of this RFC for work, the ALJ found that Plaintiff was unable to perform his past relevant work. (TR16). Given his RFC and vocational characteristics, he could perform other work available in the economy, including the jobs of interviewer, information clerk,

and production worker. (TR 16-17).

The Appeals Council denied Plaintiff's request for review (TR 1-3), and therefore the ALJ's decision is the final decision of the Commissioner. See 20 C.F.R. § 404.981; Wall v. Astrue, 561 F.3d 1048, 1051 (10th Cir. 2009).

II. Standard of Review

In this case, judicial review of the final Commissioner's decision is limited to a determination of whether the ALJ's factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied. Wilson v. Astrue, 602 F.3d 1136, 1140 (10th Cir. 2010); Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It requires more than a scintilla, but less than a preponderance." Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007). The "determination of whether the ALJ's ruling is supported by substantial evidence must be based upon the record taken as a whole. Consequently, [the Court must] remain mindful that evidence is not substantial if it is overwhelmed by other evidence in the record." Wall, 561 F.3d at 1052 (citations, internal quotation marks, and brackets omitted).

III. Evaluation of Medically Determinable, Nonsevere Impairments

Plaintiff contends that the ALJ erred by failing to include any limitations in the RFC assessment concerning Plaintiff's depression and dyslexia, after finding at step two that the impairments had resulted in mild limitations in Plaintiff's activities of daily living and mild

limitations in concentration, persistence, or pace.[1]

In Wells v. Colvin, 727 F.3d 1061 (10th Cir. 2013), the Tenth Circuit Court of Appeals considered the analysis of a social security disability claimant's application at steps two and four when the step two finding is that the claimant has only nonsevere mental limitations. The court explained that "a conclusion that the claimant's mental impairments are non-severe at step two does not permit the ALJ simply to disregard those impairments when assessing a claimant's RFC and making conclusions at steps four and five. In his RFC assessment, the ALJ must consider the combined effect of *all* medically determinable impairments, whether severe or not." Id. at 1068-1069.

In Wells, the court found that the ALJ erred because he relied on, or at least appeared to rely on, his step-two findings to conclude that the claimant had no limitation at step four based on her mental impairments. Id. at 1069. In this case, the ALJ properly stated in the decision that the functional mental limitations identified at step two "are not a residual functional capacity assessment but are used to rate the severity of mental impairments at

---

[1] Within this claim of error, Plaintiff challenges the ALJ's RFC finding set forth in the decision. The ALJ stated in the RFC finding that Plaintiff could perform a limited range of sedentary work and that he could "sit, stand, or walk for a total of two hours in an eight-hour workday." (TR 14). The ALJ's hypothetical inquiry of the VE at the hearing included the ability to "sit for a total of up to six hours a day" and "stand [or] walk for a total of up to only two hours per day each. . . ." (TR 47). It is apparent that the ALJ's RFC finding in the decision contains a typographical error and that the ALJ intended to set forth an RFC finding consistent with the exertional requirements for sedentary work, *to-wit*: sitting for up to six hours a day and standing and/or walking for about two hours in an 8-hour workday. See 20 C.F.R. § 404.1567(a)("A sedentary job involves mostly sitting and may also involve occasional walking and standing in carrying out job responsibilities."); Social Security Ruling ("SSR") 83-10, 1983 WL 31251, at *5 (explaining that at the sedentary exertional level, "periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday").

steps 2 and 3 of the sequential evaluation process. The mental [RFC] assessment used at steps 4 and 5 . . . requires a more detailed assessment . . . ." (TR 13). This statement tracks the language of SSR 96-8p, which addresses consideration of mental functional limitations.

However, merely tracking the language of an administrative ruling is not sufficient. The ALJ's discussion in his decision is not adequate to fulfill the ALJ's duty at step four to determine a mental RFC assessment. At step four, the ALJ briefly discussed Plaintiff's statements concerning his functional abilities and found that Plaintiff's "current level of functioning and demonstrated abilities suggests that he retains the capacity to perform certain types of sustained work activity." (TR 15). Specifically, the ALJ pointed to objective medical evidence with respect to Plaintiff's physical impairments.

The ALJ pointed to Plaintiff's statements in the record showing he was "able to take care of his personal hygiene needs independently, assist with some of the household chores, shop, and, in certain circumstances, drive a vehicle." (TR 15). The ALJ then noted that Plaintiff could walk "normally, without the use of an assistive device" and that Plaintiff had been treated for his physical impairments with medications. (TR 15). None of this discussion is directed toward the Plaintiff's medically determinable impairments of depression or dyslexia.

The Commissioner asserts that the medical record does not include a diagnosis of dyslexia, that Plaintiff had self-diagnosed his dyslexia, and that Plaintiff's past work as a machinist indicates that Plaintiff had overcome any learning impairment in order to perform this work for a number of years. However, these *post-hoc* arguments do not cure the error

in the ALJ's decisionmaking, and the Commissioner's final decision should be reversed and remanded for further administrative proceedings.

IV. Evaluation of Treating Doctor Opinion

Plaintiff contends that the ALJ erred in analyzing the medical source opinion of Plaintiff's treating physician, Dr. Mahmood. When the opinion of a disability claimant's treating physician is considered, the ALJ must follow a specific procedure. Generally, an ALJ must give the opinion of an acceptable treating source controlling weight if it is both well-supported by medically acceptable clinical and laboratory diagnostic techniques and consistent with other substantial evidence in the record. Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2003) (quoting SSR 96-2p, 1996 WL 374188, at *2). Where an ALJ finds that a treating physician's opinion is not entitled to controlling weight, the ALJ must decide "where the opinion should be rejected altogether or assigned some lesser weight." Pisciotta v. Astrue, 500 F.3d 1074, 1077 (10th Cir. 2007). "Treating source medical opinions not entitled to controlling weight 'are still entitled to deference' and must be evaluated in light of the factors in the relevant regulations, 20 C.F.R. §§ 404.1527 and 416.927." Newbold v. Colvin, 718 F.3d. 1257, 1265 (10th Cir. 2013)(quoting Watkins, 350 F.3d at 1300).

The ALJ recognized in his decision that Dr. Mahmood, Plaintiff's long-term treating physician, had submitted a medical source opinion concerning Plaintiff's RFC for work. In that opinion, Dr. Mahmood opined that Plaintiff could sit for 4 hours during an 8-hour workday and walk/stand for a total of 8 hours during an 8-hour workday and lift up to 25 pounds. (TR 480). This assessment is consistent with the ALJ's finding that Plaintiff is

11

capable of performing work at a sedentary exertional level. See 20 C.F.R. §404.1567(a)(defining a sedentary job as one involving lifting up to ten pounds, "mostly sitting and . . . occasional walking and standing in carrying out job responsibilities").

Dr. Mahmood also opined that Plaintiff's use of his hands for repetitive movements was limited in grasping and fingering with his right hand and fingering with his left hand due to peripheral neuropathy. (TR 481). Dr. Mahmood further opined that Plaintiff would have extensive postural and environmental limitations due to peripheral neuropathy, sensory ataxia, and autonomic neuropathy, including an inability to squat, crawl, or climb and "marked" environment limitations other than driving, which was "moderately" limited. (TR 481).

Other than the sitting, standing, and walking assessments by Dr. Mahmood, the ALJ did not discuss the remainder of Dr. Mahmood's medical source opinion. In a single paragraph addressing medical source opinions, the ALJ briefly recognized that state agency medical consultants had reached differing RFC assessments for Plaintiff and found that the medical consultant who opined Plaintiff could perform sedentary work was "most consistent with the evidence, including the claimant's testimony, and hereby gives it slightly more weight." (TR 16). However, the ALJ did not expressly discuss Dr. Mahmood's opinion with respect to Plaintiff's use of his hands or other postural and environmental limitations. Although the ALJ's RFC finding included some postural and environmental limitations, none of these limitations are consistent with Dr. Mahmood's opinion.

Because of the complete absence of any discussion of the remainder of Dr.

Mahmood's medical source opinion, the Commissioner erred in evaluating the physician's opinion, and the Commissioner's decision should be reversed and remanded for further administrative proceedings.

V. <u>Evaluation of Third Party Testimony</u>

Plaintiff contends that the ALJ erred by failing to discuss the testimony of Plaintiff's wife at the administrative hearing or evaluate the credibility of her testimony. The pertinent regulations provide that adjudicators may consider information from other "non-medical sources." For instance, adjudicators "may . . . use evidence from other sources to show the severity of [a claimant's] impairment(s) and how it affects [the claimant's] ability to work. . . . Other sources include . . . (4) [o]ther non-medical sources (for example, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, and clergy)." 20 C.F.R. §404. 1513(d)(4).

SSR 06-3p, 2006 WL 2329939, specifically advises that "[s]ince there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not 'acceptable medical sources' and from 'non-medical sources' who have seen the claimant in their professional capacity." <u>Id.</u> at *6. Because "all the ALJ's required findings must be supported by substantial evidence," <u>Haddock v. Apfel</u>, 196 F.3d 1084, 1088 (10th Cir. 1999), the ALJ must "discuss[ ] the evidence supporting [the] decision" and must also "discuss the uncontroverted evidence [the ALJ] chooses not to rely upon, as well as significantly probative evidence [the ALJ] rejects." <u>Clifton v. Chater</u>, 79 F.3d 1007, 1010 (10th Cir. 1995).

The ALJ's decision does not address Plaintiff's wife's testimony at the administrative hearing. However, Plaintiff does not contend that his wife provided significantly probative evidence that should have been discussed by the ALJ. Her testimony was brief and somewhat vague. Thus, any error in the ALJ's failure to discuss this third party testimony is harmless.

VI. Credibility

Lastly, Plaintiff contends that the ALJ's credibility determination was faulty. The ALJ found that Plaintiff's testimony and subjective statements were "not credible to the extent [the testimony and statements] are inconsistent with [the ALJ's RFC] assessment." (TR 15). The Commissioner responds that substantial evidence in the record supports the ALJ's credibility finding.

The assessment of a claimant's RFC at step four generally requires the ALJ to "make a finding about the credibility of the [claimant's] statements about [her] symptom(s) and [their] functional effects." SSR 96-7p, 1996 WL 374186, at * 1. "Credibility determinations are peculiarly within the province of the finder of fact, and [courts] will not upset such determinations when supported by substantial evidence." Diaz v. Secretary of Health & Human Servs., 898 F.2d 774, 777 (10th Cir. 1990). But an ALJ must "consider the entire case record and give specific reasons for the weight given to the individual's statements" in determining a claimant's credibility. SSR 96-7p, 1996 WL 374186, at * 4. Credibility findings must "be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." McGoffin v. Barnhart, 288 F.3d 1248, 1254 (10th Cir.

2002)(quotations and alteration omitted).

In addition to objective evidence, the ALJ should consider certain factors in evaluating a claimant's incredibility, including the claimant's daily activities; the location, duration, and intensity of the claimant's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; any treatment other than medications the individual receives or has received for pain or other symptoms; any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. SSR 96-7p, 1996 WL 374186, at * 3. See Hamlin v. Barnhart, 365 F.3d 1208, 1220 (10th Cir. 2004)(stating ALJs "should consider" factors set forth in SSR 96-7p); Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995); 20 C.F.R. § 404.1529(c)(3)(listing factors relevant to symptoms that may be considered by ALJ).

An ALJ is not, however, required to conduct a "formalistic factor-by-factor recitation of the evidence." Qualls v. Apfel, 206 F.3d 1368, 1372 (10th Cir. 2000). Employing "common sense" as a guide, the ALJ's decision is sufficient if it "sets forth the specific evidence he [or she] relies on in evaluating the claimant's credibility." Id.; Keyes-Zachary v. Astrue, 695 F.3d 1156, 1167 (10th Cir. 2012).

In connection with the ALJ's credibility finding, the ALJ discussed specific objective medical evidence in the record, including the results of CT scans of Plaintiff's brain, head, and neck, EMG testing, and physical examinations showing Plaintiff had full range of motion

15

in his joints and an "overall" normal gait. (TR 15). The ALJ also pointed to Plaintiff's daily activities, which the ALJ characterized as showing Plaintiff was "able to take care of his personal hygiene needs independently, assist with some of the household chores, shop, and, in certain circumstances drive a vehicle." (TR 15). The ALJ also discussed other relevant factors such as Plaintiff's medications and his physicians' advice concerning the "importance of diet and weight compliance in pursuit of symptom alleviation." (TR 15).

Although the ALJ did not, as Plaintiff suggests, indicate why certain test findings and his doctors' advice were relevant to the credibility determination, the credibility finding and discussion were adequately linked to substantial evidence in the record to support the finding. Thus, no error occurred in this regard.

## RECOMMENDATION

In view of the foregoing findings, it is recommended that judgment enter REVERSING the decision of the Commissioner and REMANDING the case to the Commissioner for further administrative proceedings. The parties are advised of their respective right to file an objection to this Report and Recommendation with the Clerk of this Court on or before _____ April 8th, 2014, in accordance with 28 U.S.C. § 636 and Fed. R. Civ. P. 72. The failure to timely object to this Report and Recommendation would waive appellate review of the recommended ruling. Moore v. United States, 950 F.2d 656 (10th Cir. 1991); cf. Marshall v. Chater, 75 F.3d 1421, 1426 (10th Cir. 1996)("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived.").

This Report and Recommendation disposes of all issues referred to the undersigned

16

Magistrate Judge in the captioned matter, and any pending motion not specifically addressed herein is denied.

ENTERED this ____19th____ day of ____March____, 2014.

*/s/ Gary M. Purcell*
GARY M. PURCELL
UNITED STATES MAGISTRATE JUDGE